**[Cite as *State v. Turner*, 2023-Ohio-1516.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29397 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 00825/2 |
| | : | |
| KING TURNER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 5, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

MICHAEL J. SCARPELLI, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, King Turner, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of multiple counts of aggravated burglary, felonious assault, aggravated murder, felony murder, having a weapon while under disability, and related firearm specifications. In support of his

appeal, Turner contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Turner also contends that the trial court committed prejudicial error and violated his constitutional right to be present during trial when it removed him from the courtroom after he clapped at the conclusion of the State's closing argument. Turner further claims that the trial court erred by imposing consecutive prison sentences. For the reasons outlined below, we disagree with Turner's claims and will affirm the judgment of the trial court.

## Facts and Course of Proceedings

{¶ 2} On June 3, 2020, a Montgomery County grand jury returned an indictment charging Turner with the following offenses:

- two counts of aggravated burglary (physical harm);

- two counts of aggravated burglary (deadly weapon);

- two counts of felonious assault (serious physical harm);

- two counts of felonious assault (deadly weapon);

- two counts of aggravated murder (while committing aggravated burglary);

- two counts of felony murder (proximate result of aggravated burglary);

- two counts of felony murder (proximate result of felonious assault); and

- two counts of having a weapon while under disability (prior offense of violence).

All of the counts, except the two counts for having a weapon while under disability, included a three-year firearm specification.

{¶ 3} The indicted charges and specifications stemmed from allegations that during the early morning hours of December 21, 2019, Turner and three accomplices—Malik Ogletree, Daylequan Arnold, and Deon Harris, a.k.a. "Booman"—broke into an apartment at 937 Ethel Avenue in Dayton for purposes of stealing drugs, money, and other valuables. It was further alleged that Turner and his accomplices shot and killed the residents therein, Frankie McGee and Christopher Huntley. Turner pled not guilty to the charges, and the matter proceeded to a seven-day jury trial.

{¶ 4} Turner was tried with one of his co-defendants, Harris, who was indicted on the same charges.[1] The other two co-defendants, Ogletree and Arnold, were also indicted, but they negotiated plea agreements with the State prior to Turner and Harris's trial. Ogletree pled guilty to two counts of aggravated murder with two firearm specifications and to one count of tampering with evidence. As part of his plea agreement, Ogletree agreed to testify against Turner and Harris at trial. Arnold pled guilty to two counts of aggravated murder with two firearm specifications and agreed that he had no exculpatory evidence to offer on his co-defendants' behalf.

{¶ 5} A total of 35 witnesses testified during Turner and Harris's trial and over 230 exhibits were admitted into evidence. Turner chose to testify in his defense while Harris exercised his right to remain silent. The following is a summary of the relevant testimony and evidence that was presented at trial.

*Malik Ogletree*

---

[1] Harris was indicted on only one charge of having weapons while under disability.

{¶ 6} Ogletree testified that during the late-night hours of December 20, 2019, and into the early-morning hours of December 21, 2019, he, Turner, Arnold, and Booman[2] were together at the Uptown Lounge at 1235 West Third Street in Dayton. While at the Uptown Lounge, Ogletree watched Turner and Arnold perform rap music in an open mic competition and used his cell phone to take pictures of himself with Turner, Arnold, and Booman. Screenshots of the pictures were admitted into evidence as State's Exhibits 205(B) through 205(E). Ogletree specifically identified Turner as one of the individuals in the screenshots.

{¶ 7} Ogletree testified that after the festivities concluded, he, Turner, Arnold, and Booman left the Uptown Lounge together in Ogletree's maroon Chrysler 200. While Ogletree was driving, the group discussed going to 937 Ethel Avenue for purposes of robbing an apartment that Ogletree and Turner had visited earlier in the day. Ogletree testified that he and Turner had previously gone to the apartment to retrieve a Smith & Wesson revolver that had been stolen from Turner. Ogletree testified that after leaving the Uptown Lounge, he went back to the apartment on Ethel Avenue with Turner, Arnold, and Booman for purposes of stealing drugs, money, and firearms.

{¶ 8} In proceeding with the plan to rob 937 Ethel Avenue, Ogletree parked his vehicle in an alley near the apartment. Ogletree testified that he, Turner, and Arnold then put on face coverings while Booman simply placed the hood of his sweatshirt over his head. Ogletree testified that Arnold was armed with a Hi-Point nine-millimeter handgun and that Turner was armed with a Glock 17 nine-millimeter handgun that Turner

---

[2] Ogletree did not identify Harris as Booman at trial and testified that he did not know Booman's legal name.

said had been stolen from a police officer. Ogletree testified that he was carrying the Smith & Wesson revolver that he and Turner had retrieved from 937 Ethel Avenue earlier in the day. According to Ogletree, Booman was the only person in the group who was unarmed. Ogletree claimed that Booman initially did not want to participate in the robbery but was the person who had kicked in the front door of the apartment.

{¶ 9} After Booman kicked in the front door, all four men went inside the apartment. Ogletree testified that he headed to the back bedroom, where he saw a man, later identified as Huntley, reaching toward him. Ogletree testified that he thought Huntley was armed and fired multiple shots at him. Ogletree recalled that Arnold thereafter went into the back bedroom and fired another shot at Huntley.

{¶ 10} After shooting Huntley, Ogletree left the back bedroom and observed Turner "tearing the living room up" and "flipping the couch" in search of valuables. Trial Tr. Vol. IV, p. 739. Ogletree testified that he and Turner then went into another bedroom to look for items to steal. Ogletree testified that when he and Turner entered the bedroom, they found a second man, later identified as McGee, hiding under a bed. Ogletree testified that Turner and McGee started "tussling" with each other and that Turner shot McGee multiple times. Ogletree testified that during the struggle with McGee, Turner accidentally shot him (Ogletree) in the left forearm and shot himself (Turner) in the hand.

{¶ 11} After being shot, Ogletree testified that he ran back to his vehicle while bleeding, and the others followed behind him. Once in his vehicle, Ogletree drove a short distance, but he was unable to continue driving due to his injury. Ogletree testified that Booman took his place in the driver's seat and drove the group to an area near a

Rally's restaurant. While at Rally's, the group met up with an individual that Ogletree believed to be Turner's father. Ogletree testified that he departed from Rally's with Turner and Turner's father and left his vehicle with Arnold and Booman. Ogletree also testified that he left his cell phone inside his vehicle.

{¶ 12} Continuing, Ogletree testified that Turner's father drove him and Turner somewhere near Bellhaven School to have someone, who Ogletree presumed was a nurse, address Turner's wounded hand. Thereafter, Turner's father dropped Ogletree off a few streets away from the Springfield Regional Medical Center so that Ogletree could get treatment for his gunshot wound. Ogletree testified that, while walking to the medical center, he threw the Smith & Wesson revolver into a wooded area near a Rite Aid that was located across the street from the medical center.

{¶ 13} Ogletree confirmed that the police had made contact with him at the medical center and that he initially told the officers that he had been present at 937 Ethel Avenue but had not shot anyone. Ogletree testified, however, that he eventually decided to tell the truth a couple days after the incident due to being stricken with guilt. Although Ogletree admitted that he had changed his story in anticipation of receiving a deal from the police, he clarified that there had been no official plea agreement with the State when he decided to tell the truth. Ogletree testified that the plea agreement he eventually entered into had required him to plead guilty to two counts of aggravated murder with firearm specifications and one count of tampering with evidence and to testify against Turner and Harris that their trial.

*Doctor Kent Harshbarger*

{¶ 14} Montgomery County Coroner Dr. Kent Harshbarger testified that McGee had been shot 11 times and died from multiple gunshot wounds. According to Dr. Harshbarger, two of the gunshots caused graze wounds to the back of McGee's skull and left arm while the other nine gunshots caused classic entrance wounds to McGee's shoulders, chest, right temple, right forearm, left hip, and left thigh. As for Christopher Huntley, Dr. Harshbarger similarly testified that Huntley had been shot 8 times and died of multiple gunshot wounds. Dr. Harshbarger testified that one of the gunshots caused a superficial graze wound on Huntley's left calf while the other seven gunshots caused classic entrance wounds to Huntley's face, chest, right forearm, right buttock, left shoulder, left calf, and left thigh.

*Sergeant Brian Lewis*

{¶ 15} Sgt. Brian Lewis, the administrative sergeant for the Montgomery County Regional Dispatch Center, testified that at 5:23 a.m. on December 21, 2019, the dispatch center received a 9-1-1 call regarding a shooting at 937 Ethel Avenue in Dayton. Sgt. Lewis identified a recording of that call, which was played for the jury and admitted into evidence as State's Exhibit 67. On the recording, Huntley identified himself and reported his location at the apartment. Huntley advised the 9-1-1 operator that he had been shot and that the assailants who shot him had been wearing masks. Huntley also advised that he had been asleep and that he was shot as soon as the assailants opened the door. Huntley, who was struggling to speak, pled for help and stated: "I can't move, I can't

breathe, I'm about to die." State's Exhibit 67.

*Officer Richard Thimmes*

{¶ 16} Ofc. Richard Thimmes of the Dayton Police Department testified that he was the first officer to arrive at 937 Ethel Avenue following Huntley's 9-1-1 call. Upon arriving at the scene, Thimmes observed that the front door had been forced open and the apartment had been ransacked. Thimmes also observed bullet holes in the back bedroom door and a victim, later identified as Huntley, lying on the floor face down in the back bedroom. Thimmes recalled that Huntley was still breathing and faintly asked for help. Thimmes testified that Huntley's wounds were too severe for him to treat so he proceeded to clear the apartment for safety purposes and waited for the paramedics to treat Huntley. During that time, other officers arrived at the scene and found a second shooting victim, McGee, in a front bedroom. Thimmes testified that McGee had been deceased at the time the officers found him. Thimmes also testified that he briefly spoke with a sergeant from Springfield who advised that a gunshot wound victim had been recently admitted to the Springfield Regional Medical Center and might be a suspect in the Ethel Avenue shooting.

*Detective Zach Williams*

{¶ 17} Det. Zach Williams of the Dayton Police Department testified that he was the first detective to arrive at 937 Ethel Avenue following the shooting. When he arrived at the scene, Det. Williams observed that the front door to the residence had been forced

open; the door's locking mechanism had been broken and there were fresh splinters of wood on the ground. Williams also observed that the residence showed signs of having been burglarized. Specifically, Williams noted that the couch had been flipped upside down and that everything in the residence was out of place. Williams further observed a large amount of dog feces outside the residence and a trail of blood leading from the residence to a nearby alley. Williams testified that the blood trail led to an area where a vehicle had been parked, as the blood trail ended where tire tracks from a vehicle had formed in the snow.

{¶ 18} In addition to the blood trail, Det. Williams observed two surveillance cameras located outside 937 Ethel Avenue. Williams testified that he was able to recover video footage from the cameras using a Samsung Tablet that was provided to him by Huntley's girlfriend. The video footage was played for the jury and admitted into evidence as State's Exhibit 68. The video footage showed four individuals approaching 937 Ethel Avenue at 5:13 a.m.[3] on December 21, 2019. One of the individuals could only be seen for a short time in the far-left corner of the video. The other three individuals, however, were more visible. Two of the visible individuals were wearing ski masks covering their faces, and one of them was wearing a letterman-style jacket and white high-top sneakers. The third visible individual did not have a mask on and was wearing ripped jeans, white low-top sneakers, and a hooded sweatshirt with the hood

---

[3] Although the timestamp on the video read 6:13 a.m., Det. Williams testified that he determined the timestamp was one hour ahead due to the camera's not having been adjusted for the fallback time change. Det. Williams testified that he reached this conclusion because he and his fellow officers were already at the scene investigating the crime at 6:13 a.m. Other temporal evidence, such as the 9-1-1 call which was placed at 5:23 a.m., also established that the timestamp on the video was one hour ahead.

placed over his head. At the end of the video footage, the individual wearing the hooded sweatshirt kicked in the front door to 937 Ethel Avenue.

{¶ 19} Det. Williams testified that after he viewed the crime scene, he and lead detective William Geiger went to Springfield Regional Medical Center in response to the report of a male who had recently shown up to the center with a gunshot wound. Det. Williams testified that he made contact with the male, who was later identified as Ogletree. Williams testified that Ogletree had been wearing blood-stained sweatpants and boots with dog feces on them. While at the medical center, Williams recovered video footage showing Ogletree walking across the parking lot of the medical center and into the emergency room at 6:17 a.m. that morning. The video was played for the jury and admitted into evidence as State's Exhibit 69.

{¶ 20} Later that morning, Det. Williams received a call from a street officer advising him that Ogletree's vehicle had been located behind a residence at 1609 Weaver Street in Dayton. Williams contacted the owner of 1609 Weaver Street, and the owner provided him with surveillance video footage from the residence. The video footage was played for the jury and admitted into evidence as State's Exhibit 74. It showed Ogletree's vehicle parking behind the residence at 1609 Weaver Street at 5:41 a.m. on December 21, 2019. No one could be seen getting in or out of the vehicle. Williams testified, however, that Ogletree's cell phone was recovered from inside the vehicle.

{¶ 21} In continuing with the investigation, Det. Williams testified that he received information from Ogletree's family members regarding the individuals Ogletree was with on the night of the shooting. In light of that information, on December 22, 2019, Williams

and other police officers went to Arnold's apartment at 28 Bragg Place, and they discovered Turner and Arnold hiding there. The officers placed Turner and Arnold in custody and collected their cell phones.

{¶ 22} After Turner was taken into custody, Det. Williams contacted Turner at the police department's safety building. At that time, Det. Williams noticed that Turner's hand was actively bleeding and wrapped in a blood-soaked bandage. When Williams asked Turner about the injury, Turner told him that a lawn mower had broken his hand. Williams thereafter had Turner taken to Grandview Hospital to receive treatment for his injury. While at the hospital, Williams collected Turner's DNA pursuant to a warrant while another officer photographed Turner. Williams testified that the physicians who had treated Turner advised him that Turner had sustained gunshot wounds to his left thumb and index finger.

{¶ 23} Det. Williams testified that he thereafter spoke with Turner in the emergency room. According to Williams, Turner told him "I don't want to be no snitch, but I wasn't no trigger man." Trial Tr. Vol. III, p. 613. Williams also recalled Turner saying that he would "much rather do 20 years in prison than ever help the police." *Id.* When Williams asked Turner where he had been located when he was shot, Turner responded that he was "shot on Otterbein." *Id.* at 614.

*Detective William Geiger*

{¶ 24} Det. William Geiger provided testimony regarding the homicide investigation and regarding Turner's prior felony convictions. With regard to Turner's

prior convictions, Geiger identified judgment entries showing that Turner had been convicted for third-degree-felony burglary in Montgomery C.P. No. 2015-CR-3286/1 and third-degree-felony assault in Montgomery C.P. No. 2015-CR-357/1. *See* State's Exhibits 228 and 229. Det. Geiger testified that these convictions prohibited Turner from carrying a firearm.

### Sergeant Thomas Cope

{¶ 25} Sgt. Thomas Cope of the Dayton Police Department testified that when Ogletree was questioned by the police on December 21, 2019, Ogletree admitted to being present at 937 Ethel Avenue at the time of the shooting but denied shooting anyone. Cope testified that when he later interviewed Ogletree on December 23, 2019, Ogletree provided more details about the shooting and identified the three individuals who were with him. Cope also testified that Ogletree told him that he had used a revolver during the shooting, and Ogletree took Cope to the location where he had disposed of the revolver. Cope stated that the revolver was recovered in some brush near a Rite Aid that was located across the street from the Springfield Regional Medical Center. After recovering the revolver, Cope observed that there were five shell casings in the revolver's cylinder with no bullets.

### Officer Craig Stiver

{¶ 26} Ofc. Craig Stiver, an evidence technician for the Dayton Police Department, testified to executing a search warrant for a red Ford Explorer that was towed from

Arnold's apartment at 28 Bragg Place. While searching the vehicle, Stiver collected a bill of sale and temporary tags showing that the vehicle belonged to Arnold. Stiver also collected a black trash bag containing a letterman-style jacket, a gray ski mask, and black sweatpants. Other items of clothing not inside the trash bag were also found in the back of Arnold's vehicle. Specifically, Stiver collected a blue Adidas jacket, t-shirt, and sweatpants. Stiver testified that he had packaged and tagged these items and placed them in the Dayton Police Department's property room.

*Expert Forensic DNA and Serology Testimony*

{¶ 27} Forensic experts from the Miami Valley Regional Crime Lab performed DNA and serology analysis on swabs taken from the crime scene, the revolver used by Ogletree, Ogletree's Chrysler 200, and a Dodge Ram truck owned by Turner's father. The forensic experts also analyzed the items of clothing collected from Arnold's vehicle.

{¶ 28} The analysis of the swabs from the crime scene established that the blood trail on the sidewalk, street, and snow outside the Ethel Avenue apartment was from Ogletree. Ogletree's blood was also found on a left tennis shoe that was located outside the residence. In addition, Ogletree's blood was found inside the Dodge Ram truck that belonged to Turner's father and on the driver's seat of Ogletree's Chrysler 200.

{¶ 29} The DNA analysis also established that Turner's blood was located on the front passenger-side door of Ogletree's vehicle and on the blue Adidas sweatpants and jacket that were discovered in the back of Arnold's vehicle. The blue Adidas sweatpants also had sufficient "wear DNA" to conclude that Turner had been wearing the sweatpants

at some point in time. The letterman-style jacket and black sweatpants found in Arnold's vehicle also had sufficient wear DNA on them to establish that Arnold had been the major DNA contributor on those items.

{¶ 30} The revolver that Ogletree led the officers to was tested for touch DNA. The analyst who conducted the testing testified that the revolver had a partial mixed DNA profile. The analyst explained that this established that there was more than one person's DNA on the revolver, but there was too little DNA present to identify the DNA contributors.

*Firearms Testimony*

{¶ 31} Evidence technicians testified to collecting ten Federal Cartridge nine-millimeter Luger casings and eight Winchester nine-millimeter Luger casings from the crime scene, as well as bullets, bullet fragments, and other items. A firearms expert from the Miami Valley Regional Crime Lab testified that all the Winchester casings and seven of the Federal Cartridge casings could be matched to a black Glock 17 with the serial number WMU977. The State presented testimony establishing that the Glock had been stolen from the trunk of Officer Linville Jenkins's vehicle on December 9, 2019, and had been recovered by Officer Jamie Luckoski at an illegal liquor establishment on January 31, 2020.

{¶ 32} Most of the casings fired by the Glock were found in or near the front bedroom where McGee had been shot. The firearms examiner testified that two of the projectiles recovered from McGee's autopsy were possibly fired from the Glock as well.

However, a majority of the bullets and bullet fragments collected from McGee's autopsy provided inconclusive results or were unsuitable for comparison.

{¶ 33} The firearms expert did, however, confirm that a bullet collected from Huntley at the hospital and two bullets collected from Huntley's autopsy were fired from the Smith & Wesson revolver to which Ogletree had led the officers. The firearms expert was also able to confirm that two of the bullets recovered from 937 Ethel Avenue were fired from the Smith & Wesson revolver. In addition to the Smith and Wesson revolver and Glock, the firearms expert testified that the casings collected at the apartment indicated that two unidentified firearms had also been fired at the crime scene.

*Special Agent Lance Kepple*

{¶ 34} Special Agent Lance Kepple, a member of the Federal Bureau of Investigation's Cellular Analysis Survey Team, testified to analyzing Turner's, Ogletree's, and Arnold's cell phone data and to preparing an analysis report. Kepple testified that his analysis showed that between approximately 2:00 a.m. and 2:45 a.m. on December 21, 2019, the usage of Turner's and Ogletree's cell phones was consistent with their being at or near the Uptown Lounge. Kepple testified that from approximately 4:45 a.m. to 5:20 a.m., Turner's, Ogletree's, and Arnold's cell phones were all using cell towers consistent with being at or near 937 Ethel Avenue. Kepple also testified that at approximately 5:40 a.m., Turner's phone was heading north from the Ethel Avenue area toward his father's residence at 74 Meadow Drive in Dayton. Then, at approximately 6:00 a.m., Turner's phone began moving at highway speeds from Dayton to Springfield. Kepple testified that

around that same time, Ogletree's and Arnold's phones were using cell towers consistent with being at or near 1609 Weaver Street and 28 Bragg Place.

*Daylequan Arnold*

{¶ 35} Arnold testified to a similar version of events as Ogletree, with the exception that Arnold's version excluded Turner's presence from the criminal activity in question. During his testimony, Arnold admitted that he, Turner, Ogletree, and Harris, who Arnold also knew as "Booman," left the Uptown Lounge together during the early morning hours of December 21, 2019. Arnold identified each of those individuals and himself in the Uptown Lounge screenshot pictures taken from Ogletree's cell phone. Arnold, however, testified that the group dropped Turner off at his house before he and the others went to 937 Ethel Avenue. Arnold claimed that when Turner was dropped off, Turner left his Glock and cell phone in Ogletree's vehicle.

{¶ 36} Like Ogletree, Arnold testified that Harris/Booman kicked in the front door to 937 Ethel Avenue. Arnold claimed that the fourth person shown on the surveillance video was not Turner, but an unknown individual; he did not explain how the unknown fourth person came to be with the group.

{¶ 37} In contrast to Ogletree's version of events, Arnold testified that he was the person who used Turner's Glock and was the first person to shoot the man in the back bedroom, Huntley. Arnold claimed that Ogletree also fired at Huntley, but he was unsure whether Ogletree ever hit him. Arnold also claimed that he was the person who found the second man, McGee. Arnold testified that he found McGee under the bed in the

same back bedroom where he had shot Huntley, as Arnold claimed he only went into one bedroom during the shootings. Arnold also testified that he was the person who accidentally shot Ogletree.

{¶ 38} Arnold claimed that after the group left Ethel Avenue, he contacted Turner's father in an effort to return Turner's Glock and cell phone. Arnold testified that he, Ogletree, Harris, and the unknown fourth person thereafter drove to a location off Salem Avenue where they met up with Turner. Unlike Ogletree, Arnold testified that they never met up with Turner's father.

{¶ 39} After meeting with Turner, Arnold claimed that Turner got into a "tussle" in Ogletree's vehicle which resulted in Ogletree's accidentally shooting Turner. Arnold stated that Ogletree was thereafter picked up by an unknown person. Arnold specifically testified that neither Turner nor Turner's father picked up Ogletree. Thereafter, Arnold claimed that he, Harris, and the unknown fourth person used Ogletree's vehicle to drop him off at his apartment at 28 Bragg Place. Arnold admitted that the police later found him and Turner hiding at 28 Bragg Place the next day.

{¶ 40} On cross-examination, Arnold acknowledged that the version of events he had testified to was not what he had previously told the authorities. Arnold admitted that on December 22, 2019, the day he was arrested, he initially denied being at 937 Ethel Avenue on the night in question and claimed that he had been with his girlfriend. Arnold also admitted that he later acknowledged his involvement in the offenses when he met with the prosecutor and Det. Geiger on September 17, 2020. Arnold did not dispute that, during that meeting, he identified Turner as the fourth participant in the offenses and

provided the prosecutor and Geiger with detailed information about how the offenses had been committed.  Specifically, Arnold admitted that he had told the prosecutor and Geiger that when Ogletree opened fire on Huntley in the back bedroom, he (Arnold) got scared, ran out of the apartment, and did not see anything else.   Arnold also admitted to previously telling the authorities that he was afraid of Turner, that his girlfriend was being threatened, and that Turner, not he, had called Turner's father after the shooting.

{¶ 41} Also during cross-examination, Arnold identified an e-mail that he had sent to Ogletree's sister on August 9, 2020.   The e-mail was admitted into evidence as State's Exhibit 235.   In the e-mail, Arnold indicated that he, Turner, Ogletree, and Harris/Booman had been the perpetrators of the offenses in question.   Arnold wrote that he "didn't kill anyone" and "was the first person to run out of the house as soon as I heard shooting[.]" State's Exhibit 235.   Arnold also wrote: "[I]t was just supposed to be a burglary, I didn't even wanna go * * * but [Turner] insisted and influenced (sic) we go, so we went."     *Id.* Arnold additionally wrote: "[Ogletree] did start shooting the first dude when we first went inside the house that['s] why I ran. * * * I ran out the house to [Ogletree's] car soons (sic) I heard gunshots cause I got scared[.]"     *Id.*   Arnold further wrote that: [A]fter I was at the car   * * * Booman came to the car, then [Turner], then [Ogletree]" and that "Booman dropped off [Turner] and [Ogletree] first and then took me home."     *Id.*

{¶ 42} During his testimony, Arnold acknowledged that, in reaching a plea agreement with the State, he had told the prosecutor that he had no exculpatory evidence to offer on his co-defendants' behalf.   Arnold testified, however, that he had lied during his previous interviews with the prosecutor and detectives and claimed that what he wrote

in the e-mail to Ogletree's sister had not been true.


*King Turner*

**{¶ 43}** Turner testified that, on the night in question, he went to the Uptown Lounge for an open mic rap competition where he competed against his longtime friend Harris, who performed under the name "Fenom OB." Trial Tr. Vol. VIII, p. 1561. Turner claimed that he left the Uptown Lounge with Ogletree, Arnold, and "some other individual" in Ogletree's vehicle. *Id.* at 1552. Although Turner identified Harris at trial, Turner claimed that Harris was not the fourth individual who left the Uptown Lounge with him, Ogletree, and Arnold. After leaving the Uptown Lounge, Turner claimed that he, Ogletree, Arnold, and the unknown fourth individual drove around until he (Turner) asked to be dropped off because he was intoxicated. Turner claimed that the group thereafter dropped him off at his grandfather's house, at which time he left his Glock and cell phone in Ogletree's vehicle. From there, Turner claimed that he went to his father's home, where he met up with his girlfriend and eventually fell asleep.

**{¶ 44}** Continuing, Turner testified that he was awakened by his father, who had received a phone call from someone who was trying to reach Turner in order to return his Glock and cell phone. Turner claimed that his father thereafter drove him to a nearby Rally's, where he met Ogletree, Arnold, and two unknown individuals. Turner recalled that Arnold and Ogletree had been sitting in the backseat of Ogletree's vehicle, while the two unknown individuals had been sitting in the driver and front-passenger seats. Turner claimed that the unknown individual in the front-passenger seat was holding his Glock.

After retrieving his phone from Arnold, Turner claimed that he tried to grab his Glock from the front-seat passenger, which resulted in a struggle and his (Turner's) getting shot in the hand.

{¶ 45} On cross-examination, Turner admitted that the police discovered him hiding with Arnold at 28 Bragg Place the day after the Ethel Avenue shooting. Turner also admitted to originally telling the police that he had injured his hand in a lawnmower accident and then later saying that he was shot on Otterbein. At trial, however, Turner maintained that he was shot while trying to grab his Glock from an unknown individual in Ogletree's vehicle at Rally's. Turner admitted that the Glock used during the crimes at Ethel Avenue was his gun. Turner also testified that the person who had sold him the Glock told him that it had been stolen from a police officer.

*Leon Turner*

{¶ 46} Turner's father, Leon Turner, testified that Turner and Turner's girlfriend were at his home on Meadow Drive in Dayton during the early morning hours of December 21, 2019. Turner's father testified that he received a call from Turner's phone that morning and handed the phone to Turner. Turner's father claimed that Turner thereafter asked to borrow his truck. Turner's father said he declined Turner's request but offered to drive Turner to where he wanted to go. Turner's father thereafter testified to driving Turner to a Rally's off Gettysburg Avenue.

{¶ 47} Continuing, Turner's father recalled arriving at Rally's and Turner's getting out of his truck to meet with a vehicle that had pulled up behind them. Thereafter,

Turner's father heard a boom and saw that Turner and another individual had been injured. Turner's father testified that he later learned that the other injured individual was Ogletree. Turner's father testified that he gave Ogletree a towel to wrap around his injury and drove Ogletree to the Springfield Regional Medical Center at Ogletree's request. Thereafter, Turner's father claimed that he took Turner home and treated Turner's wound with an ACE bandage. Turner's father did not take Turner to the hospital because Turner was on parole and did not want to get in trouble.

*Shaniqua Jones*

{¶ 48} Turner's girlfriend, Shaniqua Jones, testified that she had gone to spend time with Turner at Turner's father's house during the early morning hours of December 21, 2019. However, Jones did not recall what time she had arrived or left. Jones simply testified that she left Turner's father's house while Turner was still there.

*Verdict and Sentencing*

{¶ 49} After considering the testimony and evidence presented at trial, the jury found Turner guilty of all the indicted counts and specifications. At sentencing, the trial court merged several of Turner's offenses, after which the State elected to have Turner sentenced for two counts of aggravated murder with two three-year firearm specifications and one count of aggravated burglary. Turner was also sentenced for one count of having a weapon while under disability. The trial court imposed 30 years to life in prison for each of the aggravated murder counts plus a total of six years in prison for the

attendant firearm specifications. For aggravated burglary, the trial court imposed an indefinite term of 11 to 16.5 years in prison. For having a weapon while under disability, the trial court imposed 36 months in prison. The trial court ordered the 36-month prison term to be served concurrently to the indefinite prison term for aggravated burglary. The trial court ordered all the other prison terms to be served consecutively to one another. Accordingly, Turner received an aggregate, indefinite term of 77 to 82.5 years to life in prison.

{¶ 50} Turner now appeals from his convictions, raising four assignments of error for review. For purposes of clarity, we will address Turner's assignments of error out of order.

## Second and Third Assignments of Error

{¶ 51} Under his second and third assignments of error, Turner contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

### Sufficiency of the Evidence

{¶ 52} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678

N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 53} In this case, Turner contends that his convictions were not supported by sufficient evidence because the State failed to establish beyond a reasonable doubt that he was one of the four assailants who broke into 937 Ethel Avenue and committed the offenses in question. After reviewing the testimony and evidence presented at trial, we find that Turner's claim lacks merit.

{¶ 54} During trial, the State presented Ogletree, who specifically testified that he, Turner, Booman, and Arnold were the individuals who committed the offenses at 937 Ethel Avenue. Ogletree also specifically testified that Turner was the individual who shot McGee. In addition to Ogletree's direct testimonial evidence identifying Turner as one of the assailants, the State presented a plethora of circumstantial evidence that supported Ogletree's testimony. For example, the State presented a surveillance video showing four assailants breaking into 937 Ethel Avenue on the morning in question. In the video, two of the assailants can be seen wearing distinctive items of clothing that match some of the clothing worn by Harris and Arnold in the pictures that were taken at the Uptown

Lounge a few hours before the shooting.[4] This is relevant to Turner because Turner was also shown in the Uptown Lounge pictures and because multiple witnesses testified that Turner left the Uptown Lounge with Ogletree, Harris, and Arnold. While there were no distinctive items of clothing that could be used to identify Turner on the surveillance video, the fact that Turner left the Uptown Lounge with the same individuals who broke into 937 Ethel Avenue just a few hours later supported Ogletree's testimony that Turner was one of the assailants.

{¶ 55} Also supporting Ogletree's testimony was Agent Kepple's cell phone data analysis which established that Turner's cell phone was located in the area of 937 Ethel Avenue at the time of the break-in and shootings. The State also presented evidence establishing that the stolen Glock, which Turner did not deny was in his possession on the night in question, was the firearm that matched several of the shell casings that were collected at the crime scene.

{¶ 56} Additionally, the State presented DNA evidence establishing that Turner's blood was on Ogletree's vehicle and on the blue Adidas jacket and sweatpants that were found in the back of Arnold's vehicle. The DNA evidence also established that Turner had worn the blue Adidas sweatpants. The fact that the bloodstained, blue Adidas sweatpants were worn by Turner and were found in Arnold's vehicle along with Arnold's letterman-style jacket that Arnold admitted to wearing during the break-in and shootings suggests that Turner was with Arnold and the others during the offenses in question.

---

[4] Harris can be seen wearing the same ripped jeans and white low-top sneakers that he was wearing in the screenshot pictures taken from the Uptown Lounge. Arnold, who wore a letterman-style jacket during the offenses, can also be seen wearing the same white high-top sneakers that he was wearing at the Uptown Lounge.

Furthermore, multiple officers testified that the day after the shootings, Turner was discovered hiding from the police with Arnold at Arnold's apartment. The fact that Turner was hiding from the police with one of the assailants was strong circumstantial evidence of Turner's involvement in the offenses.

{¶ 57} Therefore, when construing the evidence in a light most favorable to the State, we find that a rational juror could have concluded that Turner, while armed with a firearm, forcefully broke into an occupied residence at 937 Ethel Avenue with three accomplices while having the intent to commit a robbery therein, thus committing aggravated burglary with a deadly weapon in violation of R.C. 2911.11(A)(2). A rational juror could have also concluded that Turner committed aggravated murder in violation of R.C. 2903.02(B) by shooting and killing one of the occupants, McGee, during the aggravated burglary. In addition, there was sufficient evidence to conclude that Turner assisted the plan that aided and abetted the shooting death of Huntley during the aggravated burglary, and in doing so, he committed an additional count of aggravated murder by complicity. R.C. 2923.03(A)(2). Because the evidence established that Turner used a firearm during those offenses, there was also sufficient evidence to support the attendant firearm specifications. Lastly, there was sufficient evidence to establish that Turner had a weapon while under disability, as the evidence indicated that Turner had two prior convictions for felonies of violence and that he carried a firearm on the date in question. Accordingly, Turner's claim that all his convictions[5] were not supported by

---

[5] Given the merger of Turner's offenses at sentencing, this court need only consider the counts for which Turner was found guilty and sentenced, i.e., one count of aggravated murder as related to McGee, one count of aggravated murder as related to Huntley, one count of aggravated burglary, and one count of having weapons while under disability.

sufficient evidence lacks merit.

*Manifest Weight of the Evidence*

**{¶ 58}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* 2d Dist. Montgomery No. 22581, 2009-Ohio-525 at ¶ 12. "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8, quoting *Thompkins,* 78 Ohio St.3d 380 at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 59}** "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Id.* at ¶ 9, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "However, we may determine which of several

---

*See State v. Rodgers*, 2d Dist. Montgomery No. 29403, 2023-Ohio-734, ¶ 85; *State v. Adkins*, 2d Dist. Clark No. 2019-CA-45, 2020-Ohio-3296, ¶ 8. This is because " '[w]hen a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' " *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

competing inferences suggested by the evidence should be preferred." *Id.* "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *Id.*, citing *Wilson* at ¶ 14. "A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." *Id.*, citing *Martin* at 175.

{¶ 60} Turner contends that his convictions were against the manifest weight of the evidence because Ogletree's testimony identifying him as one of the assailants was unreliable. Turner asserts that Ogletree's testimony was unreliable because the record indicates that Ogletree changed his initial story to implicate him (Turner) in response to a plea agreement that limited Ogletree's potential prison sentence. Turner also argues that his and Arnold's version of events was more credible than Ogletree's and that the testimony of his father and girlfriend provided him with an alibi that negated his guilt. We disagree.

{¶ 61} During trial, both Turner and Arnold testified that Turner had not participated in the offenses at 937 Ethel Avenue and offered an alternative explanation for why Turner's cell phone and Glock had been traced to the crime scene and how Turner had been shot. Specifically, Turner and Arnold testified that the group had dropped Turner off before they went and committed the offenses at 937 Ethel Avenue. To explain why Turner's cell phone could be traced to 937 Ethel Avenue at the time of the break-in and shootings, both Turner and Arnold testified that Turner had left his cell phone in Ogletree's vehicle before he was dropped off. To explain why Turner's Glock was traced to the crime scene, Turner and Arnold claimed that Turner had left the Glock in Ogletree's

vehicle as well. Arnold also testified that he used Turner's Glock to shoot both victims. To explain how Turner sustained a gunshot wound to his hand and why Turner's blood was found on Ogletree's vehicle, Turner and Arnold testified that Turner had been accidentally shot when he later met up with the group to retrieve his cell phone and Glock.

{¶ 62} Upon review, we note that there were various inconsistencies and holes in Arnold and Turner's version of events. For example, Turner testified that Harris did not leave the Uptown Lounge with the group, while Arnold claimed that Harris did leave with the group and was the person who kicked in the door to 937 Ethel Avenue. Arnold also testified that Harris, Ogletree, and an unknown fourth individual were responsible for the break-in and shootings, but Arnold never accounted for how the unknown fourth person ended up with the group after they allegedly dropped Turner off.

{¶ 63} With regard to the shootings, Arnold testified that he had used Turner's Glock to shoot McGee and Huntley in the back bedroom of 937 Ethel Avenue. The evidence, however, established that McGee had been shot in the front bedroom. Arnold's ignorance of where McGee was shot supported the version of events that Arnold had previously told the prosecutor and Det. Geiger, i.e., that after shots were fired, he ran away scared and did not see anything. That version was also supported by the email that Arnold wrote to Ogletree's sister.

{¶ 64} Arnold also testified that Turner's father was not with Turner when he, Ogletree, Harris, and the unknown fourth individual met up with Turner after the shooting to return Turner's cell phone and Glock. Turner and his father, however, testified otherwise. Arnold also testified that it was Ogletree who had accidentally shot Turner

during the post-shooting meet-up, while Turner claimed that he had been accidentally shot by an unknown person in the front-passenger seat of Ogletree's vehicle. Arnold further testified that Harris had been present in the vehicle when Turner was accidentally shot, while Turner claimed that Harris had not been present.

{¶ 65} As for Turner's father and girlfriend, we note that neither of their testimonies provided a time frame for when Turner was allegedly at his father's house on the morning of the offenses. While Turner's father testified that he drove Turner to a Rally's where Turner was accidentally shot, if believed, that testimony did not necessarily exclude Turner from being one of the perpetrators at 937 Ethel Avenue. Moreover, it would not be unreasonable for a jury to consider the possibility that Turner's father and girlfriend had lied to protect Turner, given their relationship to him.

{¶ 66} That said, it was the province of the jury, as the trier of fact, to assess the witnesses' credibility and to determine whether the State had proven beyond a reasonable doubt that Turner had committed the offenses in question. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. " '[I]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *State v. Sutherland*, 2d Dist. Darke No. 2021-CA-16, 2022-Ohio-3079, ¶ 47, quoting *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35; *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 36.

{¶ 67} After reviewing the record and weighing all the evidence and reasonable

inferences, we find that the jury could have concluded that the defense witnesses were not credible and decided to reject their version of events in favor of the State's. Because the jury was in the best position to determine the credibility of each witness, we do not find that the jury lost its way and created a manifest miscarriage of justice simply because it credited the State's version of events. Therefore, Turner's convictions were not against the manifest weight of the evidence.

{¶ 68} Turner's second and third assignments of error are overruled.

**First Assignment of Error**

{¶ 69} Under his first assignment of error, Turner claims that the trial court committed prejudicial error by removing him from the courtroom for clapping after the State's closing argument. Turner asserts that his clapping was not so disruptive as to warrant his removal from the courtroom and that said removal violated his constitutional right to be present at trial. As a result, Turner claims this court should reverse his convictions and remand his case for a new trial. After reviewing the specific circumstances of this case, we disagree with Turner's claim.

{¶ 70} The United States Supreme Court has recognized that "[o]ne of the most basic * * * rights guaranteed by the [Six Amendment's] Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353, (1970), citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). "[A] defendant[, however,] can lose his right to be present at trial if, after he has been warned by the judge that he will be

removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id.* at 343. Indeed, "[t]he flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Id.* "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.*

{¶ 71} Crim.R. 43 also requires a defendant to "be physically present at every stage of the criminal proceeding and trial" and provides that a defendant can be removed for "disruptive conduct." Specifically, Crim.R. 43(B) provides the following:

> Where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote contemporaneous video, and judgment and sentence may be pronounced as if the defendant were present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant.

{¶ 72} In this case, the record establishes that Turner had engaged in a pattern of disruptive conduct at trial before the trial court ultimately decided to remove him from the courtroom for clapping after the State's closing argument. For example, on the second

day of trial, Turner interrupted the trial court several times while it was addressing a member of the gallery who had attempted to make contact with Turner in the hallway. During that time, Turner told the trial court judge multiple times that she was talking to the wrong person and continued to argue with the judge even after the judge told him "I don't need to hear it from you." Trial Tr. Vol. III, p. 528. Turner, however, continued to insist that the judge was talking to the wrong person and the judge finally told Turner: "[O]ne more outburst, and we will have a discussion about your continued presence in the courtroom." *Id.*

{¶ 73} Later the same day, Turner began speaking loudly during Det. Williams's testimony, and the trial court warned him that he could not "speak in a manner that people can hear [him]" because "[i]t's interrupting the recording as well as the testimony." *Id.* at 615. Then, after the jury left for the day, the trial court notified Turner and Harris that a deputy had reported observing them attempting to communicate with the jury during sidebars. In response, the trial court stated the following:

[I]f it happens again, we will have a hearing on whether you are permitted to remain in the courtroom. I have told both of you, repeatedly, that your decorum and behavior in the courtroom is expected to be appropriate; that means not talking where everybody can hear you. If I can hear you up here, they can hear you; and that isn't appropriate. When you're writing things on cups and trying to talk with jurors, that is inappropriate. * * * This is a final warning. Either you comport your behavior with a way that is expected in the courtroom, or we will have a

hearing on whether you are permitted to remain.

*Id*. at 675-676.

**{¶ 74}** The next day, the trial court reiterated the rules and provided another warning to Turner and Harris about their behavior in the courtroom. *Id*. at 679-680. Despite this warning, Turner later interrupted the State's cross-examination of Arnold by shouting: "No, I wasn't there. * * * Why you [the prosecutor] keep asking * * * No I wasn't there. * * * I wasn't there. * * * I wasn't there. * * * Keep trying to say I was there. I wasn't there. Keep trying to—I wasn't at the crime scene * * * man." Trial Tr. Vol. VIII, p. 1500-1501.

**{¶ 75}** During Turner's outburst, the trial court had the jury step out of the courtroom while the trial court continually told Turner to be quiet. Turner, however, kept interrupting the trial court and said: "Man * * * this man just told * * * this woman ten times * * * Fuck. I wasn't there. You keep trying to place me on the scene * * * I wasn't there." *Id*. at 1502. The trial court then said: "Open your mouth one more time and we will be finished. You will be removed immediately and will not be returned understood?" *Id*. at 1503. In response, Turner indicated that he understood the trial court's warning. The trial court then allowed the proceeding to continue after instructing the jury not to consider Turner's inappropriate conduct.

**{¶ 76}** On the last day of trial, the trial court once again warned Turner and Harris about their conduct in the presence of the jury and stated the following:

> [I]f you say anything out loud, at all, under any circumstance * * * in
> the presence of the jury, whether it is during testimony, closing arguments,

or during * * * jury instructions, I will immediately stop, and given the number

of warnings that you have been given, particularly you, Mr. Turner, you will

immediately be removed. I'm not messing. I'm not playing. After that

stunt yesterday; sir, you have used up every possible pass that you're going

to get. So you understand? Open your mouth today, I'm going to stop

immediately, you will be removed, you will not be returned to the courtroom.

Understood?

Trial Tr. Vol. IX, p. 1591.

**{¶ 77}** Although Turner indicated that he understood the trial court's warning, he yet again disrupted the proceedings when he slowly clapped after the State's closing argument. As a result of Turner's conduct, the trial court had the jury step out of the courtroom and advised Turner that he was going to be removed. In response, Turner told the judge: "Save your little speech. I don't (indiscernible) that shit. Shut the fuck up. * * * I don't care. * * * Again, shut the fuck up. I don't give a fuck. * * * Forget that. I don't care. I'm going to do what I want to do. You don't understand that? * * * I'm not removed. Can I go? Good job [prosecutor]. I clapped for you. You do a good job." *Id.* at 1677-1678.

**{¶ 78}** Thereafter, the trial court stated: "I am finding that the Defendant, because of his behavior will be removed [from] the courtroom, will not be returned. He can be returned for the verdict if he can behave. But so many times over the last seven days, after the warnings you have refused to. If you will remove him from the courtroom." *Id.* at 1678. In response, Turner once again said: "Shut up. * * * Shut up. Save your

speech. * * * Shut up.   Save your speech.   I don't care about your speech. * * * Fuck off bitch."   *Id.* at 1678-1679.

**{¶ 79}** Upon review, we find that Turner's behavior was extremely inappropriate and that the trial court acted reasonably and did not abuse its discretion by removing Turner from the courtroom.   Despite being repeatedly admonished about his behavior and receiving several warnings about the consequences of his actions, Turner continued to impede his trial and conduct himself in a disruptive and disrespectful manner. Through his conduct, Turner exhibited a total lack of respect for the judicial system.   Any alleged prejudice that Turner claims resulted from his removal from the courtroom was invited by his deplorable behavior, which ultimately forfeited his right to be present at trial.

**{¶ 80}** Turner's first assignment of error is overruled.

**Fourth Assignment of Error**

**{¶ 81}** Under his fourth assignment of error, Turner contends that the trial court erred by imposing consecutive prison sentences.   Specifically, Turner claims that the consecutive-sentence findings made by the trial court under R.C. 2929.14(C)(4) were clearly and convincingly unsupported by the record.   We disagree.

**{¶ 82}** When reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G).   *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 7.   Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either: (1) the record does not support the sentencing

court's findings under certain enumerated statutes (including R.C. 2929.14(C)(4), which concerns the imposition of consecutive sentences); or (2) the sentence is otherwise contrary to law. *Id.* at ¶ 9, citing R.C. 2953.08(G)(2).

{¶ 83} Under R.C. 2929.14(C)(4), a trial court may impose consecutive sentences if it finds that (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied:

(a)     The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b)     At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c)     The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 84} "[A] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. Therefore, "[t]he first step in consecutive-sentence review is to ensure that the consecutive-sentence findings under R.C. 2929.14(C)(4) have been made[.]" *State v. Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, ¶ 25. "If the trial court fails to make these findings, and that issue is properly raised on appeal, then [we] must hold that the order of consecutive sentences is contrary to law and either modify the sentence or vacate it and remand the case for resentencing." *Id.*

{¶ 85} If the R.C. 2929.14(C)(4) consecutive-sentence findings have been made, we must then determine whether the record clearly and convincingly supports those findings. *Id.* at ¶ 26. Our review of the record and findings is de novo with the ultimate inquiry being whether we clearly and convincingly find that the evidence in the record does not support the consecutive-sentence findings that the trial court made. *Id.* at ¶ 27. Therefore, we must "vacate or modify the order if, upon review of the record, the court is left with a firm belief or conviction that the findings are not supported by the evidence." *Id.*

{¶ 86} "When reviewing the record under the clear-and-convincing standard, the first core requirement is that there be some evidentiary support in the record for the consecutive-sentence findings that the trial court made." *Id.* at ¶ 28. "If after reviewing the applicable aspects of the record and what, if any, evidence it contains, [we find] that

there is no evidence in the record to support the consecutive sentence findings, then [we] must reverse the order of consecutive sentences." *Id.*

{¶ 87} "The second requirement is that whatever evidentiary basis there is, that it be adequate to fully support the trial court's consecutive-sentence findings." *Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, at ¶ 29. Accordingly, this court must "focus on both the quantity and quality of the evidence in the record that either supports or contradicts the consecutive-sentence findings." *Id.* This court "may not, for example, presume that because the record contains some evidence relevant to and not inconsistent with the consecutive-sentence findings, that this evidence is enough to fully support the findings." *Id.* "R.C. 2953.08(G)(2) explicitly rejects this type of deference to a trial court's consecutive-sentence findings." *Id.* Instead, this court is "authorized to substitute its judgment for the trial court's judgment if [we have] a firm conviction or belief, after reviewing the entire record, that the evidence does not support the specific findings made by the trial court to impose consecutive sentences, which includes the number of consecutive terms and the aggregate sentence that results." *Id.*

{¶ 88} In this case, Turner does not dispute that the trial court made all the required consecutive-sentence findings at his sentencing hearing and incorporated those findings into the judgment entry. Instead, Turner argues that two of the trial court's consecutive sentence findings are clearly and convincingly unsupported by the record. Specifically, Turner claims that the record does not contain evidence establishing that: (1) consecutive sentences were necessary to protect the public from future crime by him or to punish him; and (2) that consecutive sentences were not disproportionate to the seriousness of his

offenses and to the danger he posed to the public. After conducting our de novo review, we disagree with Turner's claim and find that there was more than adequate evidentiary support in the record for the consecutive-sentence findings at issue.

{¶ 89} Regarding the finding that consecutive sentences were not disproportionate to the severity of Turner's offenses, we find that the State presented evidence at trial indicating that Turner was the individual who incited the plan to rob 937 Ethel Avenue and provided the firearms that were used during the offenses in question. The evidence also established that Turner was the individual who shot McGee multiple times and that his conduct and the conduct of his accomplices resulted in the deaths of two young men who had children to care for. Accordingly, there is no doubt that Turner's offenses were severe in nature. Therefore, the trial court's finding that consecutive sentences were not disproportionate to the severity of Turner's offenses was not clearly and convincingly unsupported by the record.

{¶ 90} We also find that Turner's presentence investigation report ("PSI") established that Turner, who was only 23 years old at the time of sentencing, had a lengthy criminal record. Specifically, Turner had felony convictions for escape, vandalism, assault, burglary, failure to comply with an order or signal of a police officer, and having a weapon while under disability. Turner also had juvenile adjudications for criminal damaging, possession of marijuana, attempted theft, aggravated menacing, theft, assault, and obstructing official business. The PSI also established that: 1) Turner had been released from prison just four months prior to the offenses in question and had been on active post-release control; and 2) Turner was a member of a "Security

Threat Group" on the Ohio Law Enforcement Gateway network.

{¶ 91} In addition, the PSI established that, during a psychological evaluation that was conducted for one of Turner's juvenile cases, the examining doctor stated that Turner had an "impaired development of healthy socialization and empathy" and had "demonstrated a consist[ent] disregard for societal rules, authority figures, and rights/feelings of others."   We note that these characteristics were exhibited by Turner during his trial, as Turner showed a complete lack of respect for the trial court and judicial system.   We find it significant that, after the trial court told Turner he was going to be removed from the courtroom for his disruptive behavior, Turner blatantly told the trial court: "I'm going to do what I want to do.   You don't understand that?"   Trial Tr. Vol. IX, p. 1678.   Turner's comments and behavior during trial indicated that Turner had no respect for the law and had a defiant attitude that poses a threat to society.

{¶ 92} Given the information in the PSI and Turner's conduct at trial, the trial court's findings that consecutive sentences were not disproportionate to the danger Turner poses to the public and that consecutive sentences were necessary to protect the public from future crime and to punish Turner were not clearly and convincingly unsupported by the record.   Rather, there was ample evidentiary support for those findings and for the resulting aggregate, indefinite sentence of 77 to 82.5 years to life in prison.

{¶ 93} Turner's fourth assignment of error is overruled.


### Conclusion

{¶ 94} Having overruled all four of Turner's assignments of error, the judgment of

the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.