[Cite as *State v. Wood*, 2023-Ohio-2788.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-67 |
| | : | |
| v. | : | Trial Court Case No. 22-CR-0488 |
| | : | |
| MICHAEL A. WOOD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 11, 2023

. . . . . . . . . . .

KEVIN J. MILLER, Attorney for Appellee

BLAISE KATTER, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, Michael A. Wood, appeals from his conviction for operating a vehicle under the influence of alcohol ("OVI") in violation of R.C. 4511.19(A)(1)(b) following a jury trial in the Clark County Court of Common Pleas. In support of his appeal, Wood claims that the trial court erred by failing to suppress all evidence flowing from the traffic stop that resulted in his OVI arrest. Specifically, Wood claims that the

trial court erroneously determined that the deputy who initiated the traffic stop had had a reasonable, articulable suspicion to extend the traffic stop into an OVI investigation and probable cause to arrest him for OVI. Wood also claims that the trial court should have suppressed his blood-alcohol test results based on expert testimony indicating that his blood sample was rendered unreliable due to fermentation of the sample.

{¶ 2} In addition to his suppression arguments, Wood contends that he was denied his constitutional right to confrontation because the trial court admitted a laboratory report containing his blood-alcohol test results into evidence without requiring the State to present testimony from the forensic toxicologists who tested his blood. Wood also challenges two OVI guilty verdicts rendered under R.C. 4511.19(A)(2) and R.C. 4511.19(A)(1)(a), both of which merged into his conviction under R.C. 4511.19(A)(1)(b). Specifically, Wood claims that the finding of guilt under R.C. 4511.19(A)(2) was unconstitutional and that the finding of guilt under R.C. 4511.19(A)(1)(a) was against the manifest weight of the evidence. For the reasons outlined below, we find that all of Wood's claims lack merit and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 3} On June 22, 2021, a Clark County grand jury returned an indictment in Clark C.P. No. 21-CR-0384 that charged Wood with four, third-degree-felony counts of OVI. The four counts alleged the following violations of R.C. 4511.19(A):

| Count 1: | R.C. 4511.19(A)(1)(a) | operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them |
| --- | --- | --- |

| Count 2: | R.C. 4511.19(A)(2) | refusing a chemical test for drugs and alcohol after an OVI arrest if the arrestee has been previously convicted of an OVI offense within the past 20 years |
|---|---|---|
| Count 3: | R.C. 4511.19(A)(1)(b) | operating a vehicle with a blood-alcohol concentration of 0.08 percent or more but less than 0.17 percent |
| Count 4: | R.C. 4511.19(A)(1)(j)(vii) | operating a vehicle with a concentration of marijuana in the blood of at least two nanograms per milliliter |

All four counts included a repeat-offender specification under R.C. 2941.1413(A), which alleged that Wood had been convicted of five or more equivalent OVI offenses within the past 20 years.

{¶ 4} The indicted charges and specifications arose after a Clark County Sheriff's deputy initiated a traffic stop of Wood's vehicle for a license plate violation and thereafter made several observations which led the deputy to believe that Wood was operating his vehicle while under the influence of alcohol. After Wood refused to submit to field sobriety testing, the deputy placed Wood under arrest and obtained a search warrant for Wood's blood to be drawn and tested. The blood-test results ultimately established that Wood's blood contained significant concentrations of alcohol and drugs.

{¶ 5} Wood pled not guilty to the indicted charges and specifications and filed a motion to suppress. In the motion, Wood argued that all the evidence flowing from the traffic stop in question should be inadmissible at trial because the traffic stop had constituted an illegal seizure in violation of his Fourth Amendment rights. In so arguing, Wood claimed that the deputy who conducted the traffic stop had not had a reasonable,

articulable suspicion to extend the traffic stop into an OVI investigation. Wood also claimed that the deputy had not had probable cause to arrest him for OVI. In addition, Wood argued that his blood-alcohol test results should be inadmissible at trial because his blood sample was rendered unreliable by delayed refrigeration and fermentation of the sample.

{¶ 6} On February 28, 2022, the trial court held a hearing on Wood's motion to suppress. The State presented testimony from the law enforcement officers who had arrested Wood and the forensic toxicologists who had tested Wood's blood sample and authored the laboratory report that contained Wood's blood-test results. Wood presented expert testimony from a pharmacologist, Dr. Robert Belloto, Jr., who testified regarding the fermentation of Wood's blood sample. After considering the testimony and evidence presented at the suppression hearing, on March 28, 2022, the trial court overruled Wood's motion to suppress.

{¶ 7} On June 7, 2022, the State reindicted Wood in Clark C.P. No. 22-CR-0488 for the purpose of charging him with an additional OVI count and repeat-offender specification. Case No. 22-CR-0488 concerned the exact same conduct for which Wood had been indicted in Case No. 21-CR-0384, as it included the same four original counts and specifications. The only difference was that Case No. 22-CR-0488 added a fifth count that alleged a violation of R.C. 4511.19(A)(1)(j)(viii)(I) (operating a vehicle under the influence of alcohol, a drug of abuse, or combination of them with a concentration of marijuana metabolite in the blood of at least five nanograms per milliliter). Both cases remained active and were treated interchangeably by the parties until the State made an

oral motion to dismiss Case No. 21-CR-0384 on the last day of Wood's jury trial. The trial court granted the motion to dismiss, and the matter thereafter proceeded solely under Case No. 22-CR-0488.

{¶ 8} At Wood's jury trial, the State presented testimony from Deputy Brenden McDuffie and Sergeant Chad Brown of the Clark County Sheriff's Office. The State also presented testimony from Matthew McCarty, the nurse who drew Wood's blood for testing, and Treena Redmon, the forensic toxicologist who prepared the laboratory report containing Wood's blood-test results. In addition to that testimony, the State submitted photographs depicting the crime scene and the tubes that were used to store Wood's blood sample. *See* State's Exhibits 1-9. The State also submitted body camera video footage depicting Wood's encounters with Dep. McDuffie and Sgt. Brown. *See* State's Exhibits 10 and 11. The State further submitted the laboratory report containing Wood's blood-test results. *See* State's Exhibit 13. The foregoing testimony and evidence established the following information at trial.

{¶ 9} On the night of April 22, 2021, Dep. McDuffie, a law enforcement officer of five years with OVI training through Advanced Roadside Impaired Driving Enforcement ("ARIDE") and the National Highway Traffic Safety Act ("NHTSA"), was on patrol in the city of New Carlisle, Clark County, Ohio. While on patrol that night, McDuffie pulled into a Speedway gas station on North Main Street. As McDuffie pulled into the Speedway, he observed a black Oldsmobile parked 20 to 30 feet from the gas pumps with its lights on and no rear license plate.

{¶ 10} As Dep. McDuffie walked into Speedway's convenience store, he saw a

man, later identified as Wood, walking out of the store carrying a three-pack of 25-ounce cans of Natty Daddy beer. McDuffie testified that Wood stopped and gave him a "deer in headlights look" as he walked by. Trial Tr. Vol. I, p. 200. When McDuffie left the store, he observed the black Oldsmobile drive south on North Main Street. McDuffie caught up with the black Oldsmobile and followed it for less than a ¼ of a mile before initiating a traffic stop for its failure to display a license plate. McDuffie did not observe any moving violations when he followed the vehicle.

{¶ 11} After initiating the traffic stop, Dep. McDuffie approached the vehicle on the passenger side. The driver, Wood, rolled down the passenger-side window to communicate with the deputy. When the window was rolled down, McDuffie immediately detected a strong odor that he described as being the distinct type of odor that is emitted from a person when they have been drinking alcohol. McDuffie could tell that the odor was coming from Wood because there were no other occupants in the vehicle.

{¶ 12} Dep. McDuffie advised Wood that he had pulled him over for failing to have a license plate on his vehicle. McDuffie then asked Wood for his driver's license. Instead of providing the deputy with his driver's license, Wood stated that he had proof of ownership displayed on the back of his vehicle's window. McDuffie then asked Wood for his social security number, which Wood did not provide. Instead of providing the requested information, Wood asked McDuffie if he was being detained. In response, McDuffie advised Wood that he was being detained for a traffic stop and that he needed to identify himself in order to be released. Wood, however, refused to identify himself and instead invoked his Fourth, Fifth, and Sixth Amendments rights. McDuffie then

explained to Wood that he was required to identify himself during a traffic stop. In response, Wood once again invoked his Fourth, Fifth, and Sixth Amendment rights. McDuffie then told Wood that he had to identify himself and asked for his name. Wood responded that he had been instructed by his attorney to invoke the aforementioned rights and to remain silent. Wood also stated that he had not committed any crime, that he had no weapons, drugs, or warrants, and that he just wanted to go home.

{¶ 13} As Wood was talking, Dep. McDuffie noticed that the odor he had detected earlier, i.e., the odor that one emits after consuming an alcoholic beverage, became stronger and was emanating from Wood's breath. McDuffie also observed that Wood had glassy eyes and that the three-pack of Natty Daddy beer that he had seen Wood carrying earlier was lying unopened on the front-passenger seat of Wood's vehicle. In addition, McDuffie observed two open Natty Daddy beer cans on the back-passenger floorboard of Wood's vehicle. McDuffie further observed the outer wrapping that matched the two open beer cans lying on the front-passenger floorboard. Although McDuffie testified that Wood's speech was slightly slurred during the encounter, the video evidence reflected that Wood's speech was slow and drawn out at times, but not necessarily slurred.

{¶ 14} Because Wood was being uncooperative and would not identify himself, Dep. McDuffie called for backup assistance. While McDuffie was requesting backup, dispatch advised him that the driver he was dealing with might be Michael Wood. McDuffie immediately recognized Wood's name and knew that a fellow officer had recently arrested Wood for OVI. Dispatch also advised McDuffie that Wood's license

was suspended[1] and that the department had multiple cautions for Wood being anti-law enforcement.   Shortly thereafter, Wood confirmed his identity.

{¶ 15} After Wood confirmed his identity, Dep. McDuffie asked Wood if he had been drinking; Wood answered no.   McDuffie thereafter advised Wood that, based on his observations, he believed that Wood had been drinking and asked Wood if he would submit to field sobriety testing.   In response, Wood became argumentative and asked if he was legally required to do so.   McDuffie told Wood that he was free to refuse field sobriety testing, and Wood thereafter engaged in conduct indicating his refusal to partake in such testing.

{¶ 16} When backup officers arrived at the scene, Dep. McDuffie had Wood exit his vehicle.   McDuffie handcuffed Wood and stated that Wood was being arrested for OVI.   McDuffie then placed Wood in the backseat of his police cruiser so that he could take pictures of the scene and complete the necessary paperwork.

{¶ 17} Sgt. Brown, a law enforcement officer of 29.5 years with OVI training through ARIDE and NHSTA, arrived at the scene after Wood had been arrested.   Both Sgt. Brown and Dep. McDuffie approached Wood for the purpose of reading Wood the BMV 2255 form—a form that notifies an OVI arrestee of the legal consequences for refusing to submit to chemical testing for drugs and alcohol.   When the officers opened the cruiser door to read the form to Wood, Brown immediately smelled the odor of an alcoholic beverage.   After the form was read to Wood, Wood once again invoked his

---

[1] The record establishes that Wood was driving under a Financial Responsibility Act suspension in violation of R.C. 4510.16, which is not an arrestable offense. *State v. Vineyard*, 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, fn. 2.

constitutional rights and refused to submit to any chemical testing. The officers then moved Wood into Brown's police cruiser so that Brown could transport Wood to the hospital for a blood draw.

{¶ 18} After Wood was secured in Sgt. Brown's police cruiser, Wood complained about his handcuffs being too tight and requested a second set of handcuffs. Brown complied with the request and asked Wood to step out of the cruiser so that he could put another set of handcuffs on Wood. Wood had difficulty exiting the cruiser and slipped backward onto the seat. Brown assisted Wood out of the cruiser in order to put a second set of handcuffs on him. Once the handcuffs were placed on Wood, Brown transported Wood to the hospital while Dep. McDuffie went to get a warrant signed for a blood draw.

{¶ 19} At the hospital, Wood was disrespectful toward the officers, especially Dep. McDuffie. Wood used profane language, called the officers "fucking pigs," and became angry when the officers would not take off his handcuffs. *See* State's Exhibit 10. The nurse who drew Wood's blood, Matthew McCarty, noticed that Wood smelled of alcohol. McCarty drew Wood's blood at 12:40 a.m. Wood's blood sample was stored in two gray-top tubes that contain preservatives to prevent fermentation, i.e., the process by which yeast breaks down sugar in the blood and creates ethanol (alcohol).

{¶ 20} After Wood's blood was drawn, the officers transported him to his residence for release because there was no room for him in jail. When the officers released Wood at his residence, Wood screamed at them and told them to "get the fuck off his property." *See* State's Exhibit 11. Wood also screamed at the officers for not wearing face masks and for not securing their side arms. Although Wood reached the height of his anger at

his residence, he was argumentative during the entire encounter. Sgt. Brown described Wood as exhibiting "up[-]and[-]down behavior with [his] verbal communication." Trial Tr. Vol. II, p. 275. Specifically, Brown noticed that Wood would yell, then speak politely, and then yell again. Brown testified that such up-and-down behavior is indicative of intoxication.

{¶ 21} After dropping off Wood at his residence, Dep. McDuffie transported Wood's blood sample to the evidence room refrigerator at the New Carlisle police station. McDuffie put the blood sample in the refrigerator at 2:30 a.m., i.e., one hour and 50 minutes after the blood sample was drawn. The delay in refrigeration was caused by McDuffie's dropping off Wood at his residence and by McDuffie's realizing that Sgt. Brown had not signed the BMV 2255 form. McDuffie had to wait for Brown to arrive at Wood's residence to sign the form before he could give Wood a copy. After Brown signed the form, McDuffie went directly to the New Carlisle police station to refrigerate Wood's blood sample. The blood sample was thereafter collected and tested by forensic toxicologists at the Miami Valley Regional Crime Lab ("MVRCL").

{¶ 22} During trial, Wood objected to the admission of MVRCL's laboratory report into evidence on grounds that it violated his Sixth Amendment right to confrontation. Specifically, Wood took issue with the State's use of the laboratory report through the testimony of Treena Redmon, a forensic toxicologist who authored the report but did not perform any of the relevant testing on his blood sample. The trial court overruled the objection, and Redmon testified regarding the blood-test results contained in the laboratory report as well as the laboratory procedures that were used when testing

Wood's blood sample.

{¶ 23} During her testimony, Redmon explained that there had been five laboratory tests performed on Wood's blood sample. Three of the tests were initial screening tests and two were confirmation tests. Redmon testified that one of the screening tests was a general unknown drug screen, which looks for prescription-type drugs, while the other two screening tests were specifically for ethanol (alcohol) and drugs of abuse (tetrahydrocannabinol ("THC")[2]). Redmon testified that nothing was detected on the general unknown drug screen, but that the screens for alcohol and THC came back positive. In light of those positive screens, two confirmation tests were performed—one for alcohol and one for THC. Redmon testified that the confirmation test for THC established that Wood's blood had had a concentration of 11-carboxy-TCH (a THC metabolite) at 14 +/- 3 nanograms per milliliter of blood and a concentration of THC at 2.3 +/- 0.5 nanograms per milliliter of blood. Redmon also testified that the confirmation test for alcohol established that Wood's blood had had a concentration of alcohol at 0.113 +/- .009 grams per 100 milliliter of blood.

{¶ 24} With regard to fermentation, Redmon testified that refrigeration can inhibit fermentation in blood samples. Redmon also testified that she was familiar with literature on studies that have shown that storing blood samples in gray-top tubes at room temperature does not necessarily equate to an increased concentration of alcohol in the samples via fermentation. Redmon also confirmed that Wood's blood sample was not

---

[2] Tetrahydrocannabinol is the main psychoactive compound found in marijuana. I*n the Matter of B.T.*, 2d Dist. Clark No. 2022-CA-86, 2023-Ohio-2082, fn. 1, citing *State v. Reeder*, 3d Dist. Allen Nos. 1-21-08, 1-21-09, 1-21-10, 2021-Ohio-4558, ¶ 32; *State v. Graves*, 5th Dist. Ashland No. 22 COA 001, 2022-Ohio-4130, ¶ 5.

tested for fermentation.

{¶ 25} In his defense, Wood presented the expert testimony and report of pharmacologist Dr. Belloto. Dr. Belloto testified that delaying refrigeration of a blood sample can make it more susceptible to fermentation and that the preservative in the gray-top tubes is not 100% effective in preventing fermentation. Belloto also testified that the laboratory report prepared by Redmon showed that Wood's blood sample contained fermentation byproducts, i.e., acetaldehyde, acetone, and isopropanol. Belloto explained that the presence of these byproducts was strong evidence that fermentation had occurred in Wood's blood sample. Therefore, Belloto opined to a reasonable degree of scientific certainty that Wood's blood sample went through the process of fermentation, which made the blood-alcohol test results unreliable.

{¶ 26} After the State rested its case, Wood made a Crim.R. 29 motion for acquittal on each of the five OVI counts for which he was indicted. The trial court granted the motion with regards to count four, i.e., OVI under R.C. 4511.19(A)(1)(j)(vii) (operating a vehicle with a concentration of marijuana in the blood of at least two nanograms per milliliter). Due to a deficiency in the indictment, the trial court also dismissed count five, i.e., OVI in violation of R.C. 4511.19(A)(1)(j)(viii)(I) (operating a vehicle under the influence of alcohol, drug of abuse, or combination of them with a concentration of marijuana metabolite in the blood of at least five nanograms per milliliter). Therefore, the jury only deliberated on the first three counts in the indictment.

{¶ 27} The jury found Wood guilty of all three OVI counts and the attendant repeat-offender specifications. At sentencing, the trial court merged all the counts, and the

State elected to have Wood sentenced for OVI in violation of R.C. 4511.19(A)(1)(b) (operating a vehicle with a blood-alcohol concentration of 0.08 percent or more but less than 0.17 percent). The trial court thereafter sentenced Wood to 36 months in prison for OVI and a consecutive 36 months in prison for the repeat-offender specification. Accordingly, Wood received an aggregate prison term of 72 months. The trial court also suspended Wood's driver's license for ten years and ordered him to pay a $1,350 fine.

{¶ 28} Wood now appeals from his conviction, raising four assignments of error for review.

## First Assignment of Error

{¶ 29} Under his first assignment of error, Wood challenges the trial court's judgment overruling his motion to suppress. Wood claims that all the evidence flowing from his traffic stop should have been suppressed under the Fourth Amendment because Dep. McDuffie did not have a reasonable, articulable suspicion to extend his traffic stop into an OVI investigation, nor probable cause to arrest him for OVI. Wood further claims that the trial court erred by failing to suppress his blood-alcohol test results based on his expert's testimony indicating that his blood sample was rendered unreliable due to delayed refrigeration and fermentation of the sample.

### *Standard of Review*

{¶ 30} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*General Fourth Amendment Principles*

**{¶ 31}** The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution prohibit unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). "Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the 'few specifically established and well-delineated exceptions.' " *State v. Mee*, 2017-Ohio-7343, 96 N.E.3d 1020, ¶ 12 (2d Dist.), quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "One of these exceptions 'is commonly known as an investigative or *Terry* stop,' which includes the temporary detention of motorists for the enforcement of traffic laws." *Id.*, quoting *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 17, citing *Terry*.

*Reasonable Suspicion to Detain*

**{¶ 32}** "As to investigatory detentions, police officers may briefly stop and/or temporarily detain individuals to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation." *State v. Keister*, 2d Dist. Montgomery No. 29081, 2022-Ohio-856, ¶ 28, citing *Terry* and *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. However, "[a] seizure justified only by a police-observed traffic violation * * * 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). "[A]fter the reasonable period of time for issuing the traffic citation has passed, an officer must have a reasonable articulable suspicion of illegal activity to continue the detention." *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.). For example, "[a]n officer who is conducting a valid traffic stop may prolong the stop to investigate the driver for OVI if the officer has a reasonable suspicion, based on specific and articulable facts, that the driver may be intoxicated." *Toledo v. Reese*, 2018-Ohio-2981, 112 N.E.3d 514, ¶ 29 (6th Dist.), citing *State v. Graff*, 6th Dist. Lucas No. L-11-1307, 2013-Ohio-2242, ¶ 15.

**{¶ 33}** "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized

suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-557, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27. The determination of whether reasonable suspicion exists is "based on the totality of circumstances 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622,126 N.E.3d 1132, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "An assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.' " *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 34} "Many observations can satisfy this reasonable, articulable suspicion, including the odor of an alcoholic beverage emanating from the vehicle, glassy bloodshot eyes, * * * and slow or slurred speech." (Citation omitted.) *State v. Brown*, 2d Dist. Greene No. 2011-CA-52, 2012-Ohio-3099, ¶ 13. This court has repeatedly held that a *strong* odor of alcohol (alcoholic beverage) alone is sufficient to provide an officer with a reasonable, articulable suspicion of driving under the influence.[3] *State v. Louis*, 2d Dist. Montgomery No. 27268, 2017-Ohio-8666, ¶ 33, citing *State v. Tackett*, 2d Dist. Greene No. 2011-CA-15, 2011-Ohio-6711, ¶ 13, citing *State v. Marshall*, 2d Dist. Clark No. 2001-CA-35, 2001 WL 1658096, *2 (Dec. 28, 2001). *Accord State v. Robinson*, 2d Dist. Greene No. 2001-CA-118, 2002 WL 1332589, *2 (June 14, 2002); *State v. Terry*, 2d Dist.

---

[3] This court and several others have consistently used the phrase "odor of alcohol" when describing the odor an officer detects when investigating OVI cases. Although alcohol is a chemical substance with no odor, we recognize that the phrase "odor of alcohol" is meant to describe the odor that a person emits after consuming an alcoholic beverage (or beverages) and will continue to interpret that phrase in such a manner.

Montgomery No. 16066, 1997 WL 309410, *2 (June 6, 1997); *State v. Schott*, 2d Dist. Darke No. 1415, 1997 WL 254141, *5 (May 16, 1997).

**{¶ 35}** "On the other hand, this court has also held that 'a slight odor of an alcoholic beverage' coupled with three or four 'de minimus' marked lane violations and an admission of having consumed 'a couple of beers' was insufficient to create a reasonable suspicion of driving under the influence and did not justify the administration of field sobriety tests." *Louis* at ¶ 34, quoting *State v. Spillers*, 2d Dist. Darke No. 1504, 2000 WL 299550, *3 (Mar. 24, 2000). *See also State v. Morgan*, 2d Dist. Clark No. 2007-CA-67, 2007-Ohio-6691, ¶ 9 (one de minimus marked-lane violation, the odor of alcohol (alcoholic beverage) of unspecified intensity, and an admission of consuming alcohol earlier in the day did not provide reasonable, articulable suspicion of driving under the influence); *State v. Swartz*, 2d Dist. Miami No. 2008-CA-31, 2009-Ohio-902, ¶ 14-16 (no reasonable suspicion where the officer stopped the defendant for failing to signal a left turn, the defendant denied drinking alcohol, the officer observed that the defendant had glassy, bloodshot eyes, and the officer detected the odor of alcohol (alcoholic beverage) with an unspecified intensity emanating from the vehicle); *State v. Nelson*, 2d Dist. Montgomery No. 27324, 2017-Ohio-2884, ¶ 10 and 21 (no reasonable suspicion where the officer stopped the defendant for swerving outside her lane of travel two times, the defendant was compliant and cooperative through the entire encounter, the officer detected a moderate odor of an alcoholic beverage emanating from the defendant's vehicle, the odor of alcohol intensified as the defendant spoke, and the officer observed that the defendant had bloodshot, watery eyes).

{¶ 36} In *State v. Dixon*, 2d Dist. Greene No. 2000-CA-30, 2000 WL 1760664 (Dec. 1, 2000), this court held that an officer did not have reasonable suspicion to believe that the defendant was driving under the influence of alcohol where the officer stopped the defendant for a window tint violation and noticed that the defendant had glassy, bloodshot eyes and smelled of alcohol (alcoholic beverage intensity unspecified), and where the defendant admitted to consuming "one or two beers." *Id.* at *2. In so holding, we considered the fact that the traffic violation did not involve erratic driving and that the motorist's glassy, bloodshot eyes were "readily explained by the lateness of the hour, 2:20 a.m." *Id.* This court further explained that "the mere detection of an odor of alcohol, unaccompanied by any basis, drawn from the officer's experience or expertise, for correlating that odor with a level of intoxication that would likely impair the subject's driving ability, is not enough to establish that the subject was driving under the influence." *Id.*

{¶ 37} In this case, Wood contends that the trial court erroneously determined that Dep. McDuffie had a reasonable, articulable suspicion to believe that Wood was driving under the influence of alcohol to warrant extending his traffic stop into an OVI investigation. Following the suppression hearing, the trial court made its reasonable-suspicion determination based on the following findings of fact, which are supported by competent, credible evidence in the record:

- Dep. McDuffie observed Wood exiting a Speedway while carrying a three-pack of Natty Daddy beer.
- While at Speedway, Dep. McDuffie observed that Wood's vehicle did not have a rear license plate.

- Dep. McDuffie followed Wood for approximately ¼ mile and observed Wood engage in normal driving before initiating a traffic stop for the license plate violation.

- During the traffic stop, Dep. McDuffie immediately detected a strong odor of an alcoholic beverage[4] when he approached the passenger compartment of Wood's vehicle.

- As he engaged Wood in conversation, Dep. McDuffie noticed that the aforementioned odor became stronger and was emanating from Wood's breath.

- Dep. McDuffie observed that Wood had glassy eyes and that there were two open beer cans in the back-passenger compartment of Wood's vehicle.

- Dep. McDuffie observed that the three-pack of Natty Daddy beer that Wood had bought at Speedway was lying unopen on the front-passenger seat of Wood's vehicle.

- Despite Dep. McDuffie's testifying that Wood's speech was slurred, the video footage from the officers' body cameras established that Wood's speech was not slurred.

- Wood refused to cooperate with Dep. McDuffie's request for his identification information and continued to invoke his constitutional rights under the 4th, 5th, and 6th Amendments to the United States Constitution when Dep. McDuffie

---

[4] The trial court's findings of fact stated that Dep. McDuffie immediately smelled "a strong odor of alcohol"; however, Dep. McDuffie actually testified that he immediately smelled the odor of an "alcoholic beverage," as alcohol itself has no odor. Suppression Hearing Tr., p. 11; Suppression Entry, Case No. 21-CR-0384.

asked Wood to identify himself.

- After Dep. McDuffie was able to establish Wood's identity at the traffic stop, he was aware that Wood had a history of habitual drinking and driving and confirmed that Wood had a suspended driver's license.

{¶ 38} Although not discussed by the trial court, we note that Dep. McDuffie's suppression hearing testimony established that he had been a police officer for five years and that he had completed OVI training through ARIDE. McDuffie also testified that, during his training, he learned to recognize indicators of impaired driving, such as slurred speech, glassy eyes, the odor of an alcoholic beverage, certain driving behaviors, and pupil size. We also note that while the video evidence supported the trial court's finding that Wood's speech had not been slurred, there were times on the video that Wood's speech was noticeably slow and drawn out.

{¶ 39} When applying all the foregoing facts to the applicable legal standard, we find it significant that Dep. McDuffie detected a *strong* odor of an alcoholic beverage when he approached Wood's vehicle. It was also significant that the odor became stronger as Wood began speaking. As previously discussed, a strong odor of an alcoholic beverage alone is sufficient to provide an officer with a reasonable, articulable suspicion of driving under the influence. *Louis*, 2d Dist. Montgomery No. 276268, 2017-Ohio-8666, at ¶ 33. In addition, McDuffie observed two open beer cans inside of Wood's vehicle during the traffic stop. The strong odor of an alcoholic beverage emanating from Wood combined with the presence of the two open beer cans provided a solid basis to believe that Wood had been operating his vehicle under the influence of alcohol.

{¶ 40} In addition to the odor and the open beer cans, Dep. McDuffie was aware that Wood had a history of habitual drinking and driving. Although an individual's relevant criminal history cannot by itself establish reasonable suspicion, it can nevertheless be considered as part of the totality of the circumstances analysis. *United States v. White*, 584 F.3d 935, 951 (10th Cir.2009), quoting *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir.2005) (" '[I]n conjunction with other factors, criminal history *contributes powerfully to the reasonable suspicion calculus*.' " (Emphasis sic.)); *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir.2016) (noting that a person's relevant criminal history is entitled to significant weight in the reasonable suspicion analysis). *See also State v. Shook*, 4th Dist. Pike No. 13CA841, 2014-Ohio-3403, ¶ 31; *State v. Haynes*, 11th Dist. Portage No. 95-P-0007, 1996 WL 649167, *2 (July 19, 1996); *State v. Griffith*, 12th Dist. Madison No. CA97-09-044, 1998 WL 468803 * 4 (Aug. 10, 1998).

{¶ 41} We also find it significant that Wood refused to cooperate with Dep. McDuffie when the deputy asked for his identification information. A defendant's uncooperative demeanor is another factor that may be considered when determining whether there is reasonable suspicion to detain for an OVI investigation. *State v. Keserich*, 5th Dist. Ashland No. 14-COA-011, 2014-Ohio-5120, ¶ 11, citing *State v. Evans*, 127 Ohio App.3d 56, 711 N.E.2d 761, fn.2 (11th Dist.1998).

{¶ 42} Wood's lack of cooperation, his glassy eyes, the strong odor of an alcoholic beverage emanating from his breath, the two open beer cans observed in his vehicle, his known history of habitual drinking and driving, and his occasional slow speech are all factors that provided Dep. McDuffie with reasonable suspicion to detain Wood for an OVI

investigation. Accordingly, Wood's claim that Dep. McDuffie lacked reasonable suspicion to detain him is without merit.

*Probable Cause to Arrest*

{¶ 43} " 'Probable cause' supporting an arrest exists where the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to cause a person of reasonable caution to believe that an offense has been or is being committed." (Citations omitted.) *State v. Fields*, 2d Dist. Clark No. 2020-CA-19, 2020-Ohio-5538, ¶ 19. "In determining whether probable cause exists, the court considers the totality of circumstances surrounding the arrest." (Citations omitted.) *Louis*, 2d Dist. Montgomery No. 27268, 2017-Ohio-8666, at ¶ 42.

{¶ 44} In OVI cases, " '[p]robable cause to arrest does not have to be based, in whole or in part, upon a suspect's poor performance on one or more field sobriety tests.' " *Id.* at ¶ 42, quoting *Columbus v. Bickis*, 10th Dist. Franklin No. 09AP-898, 2010-Ohio-3208, ¶ 21. "Rather, '[t]he totality of the facts and circumstances can support a finding of probable cause to arrest even where no field sobriety tests were administered[.]' " *Bickis* at ¶ 21, quoting *State v. Homan*, 89 Ohio St.3d 421, 427, 732 N.E.2d 952 (2000), *superseded by statute on other grounds* as recognized in *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155.

{¶ 45} Also, " 'when used in connection with other evidence, a suspect's criminal history can support a determination of probable cause.' " *State v. Jones*, 3d Dist. Marion

No. 9-20-04, 2020-Ohio-6667, ¶ 22, quoting *State v. Shepherd*, 4th Dist. Scioto No. 07CA3143, 2008-Ohio-5355, ¶ 11. A defendant's "refusal to submit to field sobriety tests is another factor that may be considered in determining the existence of probable cause in an arrest for driving under the influence of alcohol." (Citation omitted.) *State v. Molk*, 11th Dist. Lake No. 2001-L-146, 2002-Ohio-6926, ¶ 19; *Terry,* 2d Dist. Montgomery No. 16066, 1997 WL 309410, at *2; *State v. Lilly*, 2d Dist. Montgomery No. 13390, 1992 WL 337640, *1 (Nov. 19, 1992). "The only restriction on using the refusal to perform a field sobriety test is when the request occurs after the arrest." *Findlay v. Jackson*, 3d Dist. Hancock No. 5-14-02, 2014-Ohio-5202, ¶ 33, citing *State v. May*, 7th Dist. Columbiana No. 10 CO 23, 2011-Ohio-6637, ¶ 30.

**{¶ 46}** When making its probable-cause determination, the trial court considered the same factors that it made under the reasonable-suspicion determination. The trial court also considered the fact that Wood had refused to submit to field sobriety and chemical testing. In addition, the trial court relied on the testimony of Sgt. Brown as to Wood's being intoxicated.

**{¶ 47}** Upon review, we find that it was inappropriate to consider Wood's refusal to submit to chemical testing as part of the probable-cause analysis, because the refusal occurred after Wood had already been arrested. For the same reason, it was inappropriate to consider Sgt. Brown's testimony, as Brown arrived at the scene after Wood had been arrested. In contrast, Wood's refusal to submit to field sobriety testing occurred before his arrest; therefore, it was a proper factor to consider in the probable-cause analysis.

{¶ 48} Wood contends that Dep. McDuffie lacked probable cause to arrest him for OVI because the deputy did not observe him drive erratically on the night in question and did not notice any deficiencies in his motor skills and balance prior to his arrest. With regard to Wood's driving, it was significant that McDuffie only observed Wood drive a ¼ mile before pulling him over for the license plate violation. The fact that McDuffie saw Wood drive normally for very a short distance and did not notice any motor skill or coordination issues did not outweigh all of the deputy's other observations, i.e., that Wood was uncooperative when he was asked to identify himself, the strong odor of an alcoholic beverage emanating from Wood's breath, Wood's glassy eyes and occasionally slow speech, the two open containers of beer inside Wood's vehicle, Wood's known history of habitual drinking and driving, and Wood's refusal to submit to field sobriety testing.

{¶ 49} Under the totality of these circumstances, we find that a reasonable police officer in Dep. McDuffie's position would have been justified in believing that Wood was committing an OVI offense. Accordingly, we find that there was probable cause for McDuffie to arrest Wood for OVI.

*Admission of Blood-Alcohol Test Results*

{¶ 50} For his third and last suppression argument, Wood contends that the trial court erred by failing to suppress his blood-alcohol test results based on the testimony of his expert witness, Dr. Belloto. Specifically, Wood claims that Belloto's testimony suggested that the one-hour-fifty-minute delay in refrigerating his blood sample resulted in prejudice via fermentation of the sample.

**{¶ 51}** Courts apply a burden-shifting procedure to govern the admissibility of alcohol-test results. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 24. That procedure is as follows:

The defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress * * *[.] After a defendant challenges the validity of test results in a pretrial motion, the state has the burden to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health. Once the state has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance. * * * Hence, evidence of prejudice is relevant only after the state demonstrates substantial compliance with the applicable regulation."

(Citations omitted.) *Id.*

**{¶ 52}** Here, Wood does not argue that the State failed to substantially comply with the health regulation at issue, i.e., Ohio Adm.Code 3701-53-06(G), which requires a blood sample to be refrigerated while not in transit or under examination. The Supreme Court of Ohio has held that "failing to refrigerate a blood specimen for a period of four hours and ten minutes before placing it in transit for analysis is a de minimis error and does not render the test result inadmissible for failure to substantially comply with Ohio Adm.Code 3701-53-0[6(G)]." *State v. Baker*, 146 Ohio St.3d 456, 2016-Ohio-451, 58 N.E.3d 1114, ¶ 21. Therefore, the one-hour-fifty-minute delay in this case did not render Wood's

blood-alcohol test results inadmissible unless Wood demonstrated that he was prejudiced by less than strict compliance with Ohio Adm.Code 3701-53-06(G).

{¶ 53} Wood claims that Dr. Belloto's suppression hearing testimony established the necessary prejudice to render his blood-alcohol test results inadmissible. The trial court found that Belloto testified that the blood-alcohol test results were unreliable because of evidence indicating that Wood's blood samples underwent fermentation, i.e., a biological process that converts sugars into cellular energy and produces ethanol (alcohol) and carbon dioxide as byproducts. The trial court also found that Belloto testified that it could not be determined how much ethanol Wood had consumed and how much ethanol had been produced by fermentation. But the trial court found that Belloto merely speculated on the degree to which fermentation may have increased the ethanol level in Wood's blood sample.

{¶ 54} Upon review, we find that the trial court's findings were supported by competent, credible evidence in the record. When applying these findings to the relevant legal standard, we find that Dr. Belloto's testimony failed to establish that Wood had been prejudiced by the one-hour-fifty-minute delay in refrigerating his blood sample. First, Belloto did not specifically testify that the delay in refrigeration was what had caused the blood sample to undergo fermentation. Second, Belloto's testimony did not establish what amount of ethanol was produced through the fermentation of Wood's blood sample. Therefore, it would be pure speculation to conclude that the fermentation prejudiced Wood. That is, it is possible that the amount of ethanol produced through fermentation was negligible and did not significantly skew the blood-alcohol test results. Accordingly,

we find that Dr. Belloto's testimony regarding fermentation went to the weight of the blood-alcohol test results, not their admissibility.

{¶ 55} For all the foregoing reasons, Wood's first assignment of error is overruled.


**Second Assignment of Error**

{¶ 56} Under his second assignment of error, Wood contends that his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution were violated during his trial. Wood claims that his right to confrontation was violated because the laboratory report containing his blood-alcohol test results was admitted into evidence without the State's presenting testimony from the forensic toxicologists who performed the tests. There is no dispute that the State introduced the laboratory report through the testimony of Treena Redmon, the forensic toxicologist who reviewed all the testing data and wrote the laboratory report, but who did not perform any of the relevant tests. In light of this, Wood contends that the trial court erred when it overruled his objection to the State's introduction of his blood-test results through someone other than the toxicologists who had tested his blood.

{¶ 57} Appellate courts apply a de novo review to evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. "The Confrontation Clause provides: 'In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' " *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 210. "This means that 'admission of an out-of-court statement of a witness who does not appear at

trial is prohibited * * * if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.' " *Id.*, quoting *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶ 58} A statement is testimonial if it is "made for 'a primary purpose of creating an out-of-court substitute for trial testimony.' " *Maxwell* at ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).  In other words, "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610, fn. 6 (2011), quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).  "If a statement's primary purpose is anything else, the statement is nontestimonial," meaning "[i]ts admissibility is 'the concern of state and federal rules of evidence, not the Confrontation Clause.' " *Maxwell* at ¶ 40, quoting *Bryant* at 359.

{¶ 59} In *Bullcoming*, the United States Supreme Court held that a laboratory report of blood-alcohol analysis qualified as a testimonial statement that triggered the protections of the Confrontation Clause.  *Id.* at 665.  Similar to the present case, the defendant in *Bullcoming* was charged with driving while intoxicated, and the principal evidence against him was a laboratory report certifying that the defendant's blood-alcohol concentration exceeded the legal limit.  *Id.* at 651.  The laboratory report was prepared, signed, and certified by the forensic analyst who tested the defendant's blood sample.  *Id.* at 653.

{¶ 60} Instead of presenting that forensic analyst at trial, the prosecution in *Bullcoming* introduced the laboratory report through the testimony of another forensic analyst who "was familiar with the testing device used to analyze Bullcoming's blood and with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." *Id.* at syllabus. On cross-examination, the analyst who testified admitted "that he played no role in producing the [blood alcohol concentration] report and did not observe any portion of the testing at issue." *Id.* at 673 (Sotomayor, J., concurring). The State also never asserted that the testifying analyst had any independent opinion concerning the defendant's blood alcohol concentration. *Id.* at 662.

{¶ 61} The majority in *Bullcoming* held that the surrogate analyst was not a proper substitute for the analyst who had conducted the test on the defendant's blood sample. *Id.* at 661. In so holding, *Bullcoming* explained that the kind of testimony that the surrogate analyst "was equipped to give could not convey what [the actual testing forensic analysist] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed." (Emphasis omitted.) *Id.* at 661. "Nor could such surrogate testimony expose any lapses or lies on the certifying analysist's part." *Id.* at 662. Accordingly, *Bullcoming* concluded that the Confrontation Clause "does not permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." *Id.* at syllabus, 657-

658.

{¶ 62} Justice Sotomayor's concurring opinion in *Bullcoming* pointed out that *Bullcoming* does not address "a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 672 (Sotomayor, J., concurring). Justice Sotomayor explained that because the surrogate analyst in *Bullcoming* "had no involvement whatsoever in the relevant test and report," it was unnecessary for the court "to address what degree of involvement is sufficient." *Id.* at 673. Justice Sotomayor also observed that: "It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results." *Id.* at 673.

{¶ 63} Multiple federal courts have heeded Justice Sotomayor's comments and have found *Bullcoming* to be distinguishable from a situation where a laboratory report was introduced through an analyst who did not perform the tests at issue, but who was personally involved in reviewing all the tests and data, and who compiled and signed the laboratory report. *See, e.g., Grim v. Fisher*, 816 F.3d 296, 310 (5th Cir.2016) (holding that *Bullcoming* does not address the situation where the testifying analyst examined a non-testifying analyst's report and data, ensured the non-testifying analyst did the proper tests, ensured that the non-testifying analyst's interpretation of the test results was correct, ensured that the test results coincided with the conclusions in the report, agreed with the examination results of the report, and signed the report); *Jenkins v. King*, S.D. Mississippi No. 1:15cv28-HSO-RHW, 2017 WL 27960, *8 (Jan. 3, 2017) (holding that *Bullcoming* is materially distinguishable from a situation where a testifying supervisor

reviewed the testing analyst's work, signed the laboratory report himself, and formed independent conclusions based on his own knowledge of the laboratory's procedures and his extensive experience as a drug analyst); *United States v. Peshlakai*, D. New Mexico No. 21-cr-01501-JCH, 2023 WL 4235671, *11 (June 28, 2023) (holding that an analyst who performed the final analysis, reviewed the final laboratory notes and data, and drew relevant conclusions is unlike the analyst in *Bullcoming*).

**{¶ 64}** Other federal courts have specifically held that such scenarios do not violate the Confrontation Clause. *See, e.g., United States v. Kaszuba*, 823 Fed.Appx. 77, 79 (3d Cir.2020) (no violation of right to confrontation where the testifying analyst compiled and signed the report, reviewed every test the technicians conducted and every procedure they used, and did not simply parrot what the non-testifying technician allegedly found during the testing, and was well equipped to convey what the technicians knew or observed about the particular test and process); *Williams v. Vannoy*, 669 Fed.Appx. 207, 208 (5th Cir.2016) (no confrontation clause violation where the supervisor of a laboratory was called to testify regarding the results of DNA tests where the supervisor had "had a personal connection to the scientific testing and actively reviewed the results of the forensic analyst's testing and signed off on the report").

**{¶ 65}** In the present case, Wood relies heavily on *Bullcoming* for the proposition that his right to confrontation was violated due to his blood-alcohol test results being admitted into evidence without the State's presentation of testimony from the forensic toxicologists who performed the tests on his blood sample. As previously discussed, the State instead presented the testimony of Treena Redmon, the forensic toxicologist who

authored the laboratory report containing the blood-test results. However, unlike the analyst in *Bullcoming*, Redmon's trial testimony indicated that her role was more than just a surrogate laboratory representative who parroted test results generated by other toxicologists.

{¶ 66} Redmon testified that she "did not necessarily do the physical testing" but "was the one that reviewed all the data in the end and authored the final report." Trial Tr. Vol. II, p. 349. In doing so, Redmon testified that she checked whether "the screen and the confirmation [tests] [were] correct, * * * that the chain of custody [was] appropriate, that the testing was completed, [and that] there were no issues with the controls that would have prevented a reliable result." *Id.* at 343. Redmon also testified that when writing the laboratory report she had to determine whether there were any errors and whether she agreed with the other toxicologists' findings. *Id.* at 352. In addition, Redmon testified that she found no errors or discrepancies in the test results generated by the other toxicologists. *Id.* at 380. Redmon's testimony further established that she was knowledgeable about the procedures and processes employed by her fellow toxicologists during the testing and was able to convey how those tests were performed and what the test results meant.

{¶ 67} Based on the foregoing, we find that the present case is distinguishable from *Bullcoming*. Unlike the defendant in *Bullcoming*, Wood was given the opportunity to cross-examine a knowledgeable toxicologist who had independently reviewed all the testing data, had checked the data for errors, and had written the laboratory report based on her own conclusions about the accuracy of the data. In our view, Wood's cross-

examination of Redmon was an effective means for Wood to confront any potential issues with the blood-alcohol test results that were contained in the laboratory report. Therefore, we find that Wood's right of confrontation was not compromised when Redmon's testimony was used to admit the blood-alcohol test results into evidence and thus find no Confrontation Clause violation.

{¶ 68} Woods second assignment of error is overruled.


**Third Assignment of Error**

{¶ 69} Under his third assignment of error, Wood contends that his OVI offense under R.C. 4511.19(A)(2) is unconstitutional. Under R.C. 4511.19(A)(2), a person is prohibited from refusing a chemical test for drugs and alcohol after they have been arrested for OVI if they have been previously convicted of an OVI offense within 20 years. Wood argues that a chemical test for drugs and alcohol qualifies as a search subject to Fourth Amendment protections and that R.C. 4511.19(A)(2) is unconstitutional because it punishes an individual for exercising his or her right to refuse such a search without a warrant. Wood's claim fails for multiple reasons.

{¶ 70} As a preliminary matter, we note that Wood did not raise this constitutional argument during the trial court proceedings. "[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." (Citation omitted.) *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). "The acceptable procedure is to raise any constitutional challenge to a statute in the trial court, generally by way of a specific motion, with an opportunity for

the State to respond and the trial court to rule on said motion." *State v. McCormick*, 2d Dist. Montgomery No. 29607, 2023-Ohio-1303, ¶ 12, citing *State v. Zuern*, 32 Ohio St.3d 56, 63, 512 N.E.2d 585 (1987). "Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *Awan* at syllabus.

{¶ 71} "Nevertheless, this Court has discretion to review a forfeited constitutional challenge to a statute under a plain error analysis." *McCormick* at ¶ 14, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. "The burden of demonstrating plain error is on the appellant." *Id.*, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, citing *Quarterman* at ¶ 16. "In order for plain error to exist, there must be an obvious defect in the trial proceedings that affected the defendant's substantial rights, meaning that the trial court's error must have affected the outcome of the trial." *State v. Petticrew*, 2d Dist. Clark No. 2022-CA-29, 2023-Ohio-159, ¶ 18, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. The question, therefore, is "whether, but for the error, the outcome of the proceedings *clearly* would have been otherwise." (Emphasis sic.) *State v. Hornbeck*, 155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶ 72} Upon review, we find that the constitutionality of R.C. 4511.19(A)(2) has no bearing on the outcome of the proceedings in this case, because Wood's OVI offense under R.C. 4511.19(A)(2) merged into Wood's conviction for OVI in violation of R.C.

4511.19(A)(1)(b). " 'When a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' " *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). Therefore, regardless of whether R.C. 4511.19(A)(2) is constitutional, Wood would still have been convicted under R.C. 4511.19(A)(1)(b). Accordingly, Wood cannot establish plain error.

{¶ 73} Moreover, in *State v. Hoover*, 123 Ohio St.3d 418, 2009-Ohio-4993, 916 N.E.2d 1056, the Supreme Court of Ohio held that that R.C. 4511.19(A)(2) does not violate the Fourth Amendment to the United States Constitution or Section 14, Article I of the Ohio Constitution. *Id.* at ¶ 30. The Supreme Court explained that: "Because R.C. 4511.19(A)(2) requires that an officer have probable cause to arrest for [OVI] before requesting that a driver undergo chemical testing and because the United States Supreme Court has held that exigent circumstances justify the warrantless seizure of a blood sample in [OVI] cases, * * * it is clear that R.C. 4511.19(A)(2) does not violate the Fourth Amendment to the United States Constitution or Article I, Section 14 of the Ohio Constitution." *Id.* at ¶ 23.

{¶ 74} Wood's third assignment of error is overruled.

## Fourth Assignment of Error

{¶ 75} Under his fourth assignment of error, Wood contends that the jury's verdict finding him guilty of OVI in violation of R.C. 4511.19(A)(1)(a) was against the manifest

weight of the evidence.   This claim also fails for multiple reasons.

{¶ 76} First, Wood's manifest weight claim fails because any error with regard to the jury's verdict on the OVI offense under R.C. 4511.19(A)(1)(a) is rendered harmless by virtue of its having merged into his OVI offense under R.C. 4511.19(A)(1)(b).   *See State v. Rodgers*, 2d Dist. Montgomery Nos. 29403 and 29405, 2023-Ohio-734, ¶ 85, and *State v. Adkins*, 2d Dist. Clark No. 2019-CA-45, 2020-Ohio-3296, ¶ 8. *Accord State v. Turner*, 2d Dist. Montgomery No. 29397, 2023-Ohio-1516, fn.5.   As previously discussed, " '[w]hen a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' " *Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, at ¶ 57, quoting *Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, at ¶ 70, citing *Powell*, 49 Ohio St.3d at 263, 552 N.E.2d 191.   Therefore, it makes no difference whether the jury's verdict finding Wood guilty of OVI in violation of R.C. 4511.19(A)(1)(a) was against the weight of the evidence, as any such error would be harmless beyond a reasonable doubt.

{¶ 77} Even if there had been no merger, Wood's manifest weight claim would fail on the merits as well.   "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 78} Wood claims that the weight of the evidence did not establish that he was operating a vehicle "under the influence of alcohol" as required by R.C. 4511.19(A)(1)(a). " '[B]eing "under the influence" of alcohol or intoxicating liquor means that the accused must have consumed some intoxicating beverage, whether mild or potent, and in such a quantity, whether small or great, that the effect thereof on him was to adversely affect his actions, reactions, conduct, movements or mental processes, or to impair his reactions, under the circumstances then existing so as to deprive him of that clearness of the intellect and control of himself which he would otherwise possess.' " *State v. Zimmerman*, 2d Dist. Montgomery No. 19528, 2003-Ohio-1551, ¶ 24, quoting *State v. Steele*, 95 Ohio App. 107, 111, 117 N.E.2d 617 (3d Dist.1952). *Accord State v. Banks*, 2d Dist. Greene No. 2014-CA-11, 2014-Ohio-5360, ¶ 19.

{¶ 79} In this case, the jury was presented with video footage from the officers' body cameras that captured Wood's encounter with the officers. Therefore, the jury was able to use the video footage to evaluate Wood's mannerisms, speech, and physical reactions for purposes of determining whether he was under the influence of alcohol. The video footage and accompanying testimony from Dep. McDuffie and Sgt. Brown established that Wood slipped backwards into a police cruiser as he was trying to stand

up and exit the cruiser while handcuffed. The video footage also established that Wood's speech was occasionally slow and that Wood was argumentative and uncooperative with the officers. In addition, the video footage showed that Wood displayed up-and-down behavior, which Sgt. Brown testified was indicative of intoxication. Based on this evidence and the evidence establishing that Wood smelled strongly of alcohol and had two open beer cans in his vehicle, and blood-test results showing that his blood-alcohol concentration was well above the legal limit, the jury could have reasonably concluded that alcohol had adversely affected Wood's actions, reactions, conduct, movements, or mental processes. Accordingly, the jury's finding that Wood was under the influence of alcohol was not against the manifest weight of the evidence.

{¶ 80} Wood's fourth assignment of error is overruled.

## Conclusion

{¶ 81} Having overruled all four of Wood's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and EPLEY, J., concur.